United States District Court
Eastern District of Michigan
Southern Division

United States of America,

          Plaintiff,

v.

Tribar Technologies, Inc.,

          Defendant.

_____/

Case: 2:24–cr–20552

Hon. Nancy G. Edmunds

Magistrate Hon. Anthony P. Patti

# Plea Agreement

The United States of America and the defendant, Tribar Technologies, Inc. (Tribar), have reached a plea agreement under Federal Rule of Criminal Procedure 11. The plea agreement's terms are:

## 1. Count of Conviction

The defendant will plead guilty to Count 1 of the Information. Count 1 charges the defendant with a negligent violation of a pretreatment standard under the Clean Water Act under 33 U.S.C. §§ 1317(d) and 1319(c)(1)(A).

## 2. Statutory Minimum and Maximum Penalties

The defendant understands that the count to which it is pleading guilty carries the following maximum statutory penalties:

| Count 1 | Fine: | $200,000, or twice the pecuniary gain or loss, 18 U.S.C. § 3571(d) |
| | Term of Probation: | 5 years |

## 3. Agreement Not to Bring Additional Charges

If the Court accepts this agreement and imposes sentence consistent with its terms, and as long as the defendant fulfills its obligations under its obligations under its probation term and the required Corporate Compliance Plan (Attachment A), the United States Attorney's Office for the Eastern District of Michigan and the Environmental Crimes Section, Environment & Natural Resources Section, U.S. Department of Justice, (collectively "the government"), will not bring additional charges against the defendant for any Clean Water Act violations by the defendant that occurred before the date of this agreement and of which the government is aware by the date of this agreement. This agreement is limited to criminal prosecution of the defendant and does not extend to any other parties involved in the violations.

## 4. Elements of Count of Conviction

The elements of Count 1 are:

a. On or about the dates set forth in the Information, within the Eastern District of Michigan, the defendant, by and through the actions of its agents and/or employees, operated and caused to be operated a source;

b. The defendant operated the source in violation of a pretreatment standard, namely the Wixom sewer use ordinance, which requires immediate notification of batch discharges and prohibits discharges that bypass an operator's treatment system, by discharging untreated wastewater to the Wixom sanitary sewer system and failing to provide the required immediate notice of such discharge;

c. The violation occurred after the effective date of the applicable standard, the Wixom sewer use ordinance, which is a federally enforceable pretreatment program; and

d. The defendant acted negligently.

33 U.S.C. §§ 1317(d), 1319(c)(1)(A).

5.    **Factual Basis**

The parties agree that the following facts are true, accurately describe the defendant's role in the offense, and provide a sufficient factual basis for the defendant's guilty plea:

Applicable Law and Regulatory Programs

The Clean Water Act regulates and limits discharges of pollutants into Waters of the United States such as the Huron River and its tributary, Norton Creek. Discharges to Waters of the United States are generally prohibited except pursuant to a National Pollutant Discharge Elimination System (NPDES) permit. In many municipalities, industrial users discharge wastewater to the sanitary sewer system rather than directly to a waterbody. The sanitary sewer system conveys wastewater to the publicly-owned treatment works (POTW), which then treats and discharges wastewater to a waterbody under the POTW's NPDES permit. Because POTWs cannot feasibly treat all industrial pollutants, the Clean Water Act establishes pretreatment standards that limit the type and concentration of pollutants industrial users such as Tribar may discharge to the sewer system. As a part of their NPDES permits, POTWs must establish local sewer ordinances consistent with

those pretreatment standards. These local sewer ordinances are federally enforceable under the Clean Water Act if the U.S. Environmental Protection Agency (EPA) or a state with delegated approval authority from the EPA has reviewed and approved them as a part of the POTW's pretreatment program.

The Michigan Department of Energy, Great Lakes, and Environment (EGLE) is the Michigan state agency authorized by the EPA to approve local pretreatment programs. The Wixom POTW holds an NPDES permit issued by EGLE, which permits the Wixom POTW to discharge to Norton Creek, a tributary of the Huron River. Wixom also has an EGLE-approved Industrial Pretreatment Program (IPP) that it administers and enforces through its approved sewer use ordinance and IPP permits. The Wixom sewer use ordinance applies to all users of the Wixom sanitary sewer system. The Wixom sewer use ordinance includes the following requirements, which are also incorporated in IPP permits issued by Wixom to industrial users including Tribar:

- Immediate notification by telephone to Wixom of any accidental, nonroutine, or noncustomary batch discharge.

- Prohibition on bypass, which is any intentional diversion of wastewater from any portion of a user's pretreatment system.

Tribar

Defendant Tribar Technologies, Inc. is a Delaware corporation that presently operates five active plants in southeast Michigan. Defendant's Plant 5 is located at 48668 Alpha Dr., Wixom, MI 48393.

Tribar Plant 5 is a chrome plating facility that uses an electroplating process to apply chrome finishing to plastic automotive parts. Plant 5 generates wastewater that contains chromium compounds, including hexavalent chromium. Hexavalent chromium is a known carcinogen.

At Plant 5, the defendant operates a wastewater treatment system to pretreat wastewater prior to discharging to the Wixom sanitary sewer system. Tribar first collects wastewater in holding tanks where some chemicals may be added to facilitate treatment. The wastewater is then sent from the holding tanks to a series of treatment tanks to remove pollutants including chromium. The system allows recirculation back to the beginning of the process for additional treatment prior to discharge to the sewer system if monitors show that

further treatment is needed to comply with Tribar's IPP Permit and the sewer use ordinance. Tribar's Plant 5 wastewater treatment system discharges into the Wixom sanitary sewer system which connects to the Wixom POTW.

Conduct at Issue

Between at least April 15 and August 1, 2022, Tribar held an IPP Permit for Plant 5 issued by Wixom with an effective date of April 15, 2022. The IPP Permit allowed the defendant to discharge treated wastewater into the Wixom sanitary sewer system and which flowed to the Wixom POTW. The IPP Permit included the notification requirement for batch discharges and the prohibition on bypass, as provided in the Wixom sewer use ordinance described above.

Between at least some time in March 2022 and August 1, 2022, Tribar employed two operators on alternating 12-hour shifts to run its Plant 5 wastewater treatment system. An employee of the defendant (Employee A) worked the 12-hour shift from approximately 6:00 PM to 6:00 AM. Employee A typically worked alone with no on-site supervision. More than once in this same time period, another employee of the defendant found Employee A asleep in a car in the parking lot

during Employee A's shift rather than inside Plant 5 operating Tribar's wastewater treatment system. Several times in this same time period, multiple employees of the defendant observed and informed other employees that Employee A smelled of alcohol while Employee A was working. Multiple employees notified management personnel at Plant 5 of Employee A's failure to perform wastewater treatment operator job duties. Tribar took no action against Employee A prior to August 1, 2022, and allowed Employee A to continue working at Plant 5 with no changes in Employee A's supervision, training, or job duties.

On or around July 23, 2022, Tribar Plant 5 accumulated approximately 15,000 gallons of untreated wastewater that contained high concentrations of hexavalent chromium. This wastewater had higher levels of pollutants than the wastewater typically generated from Plant 5 operations. During the week beginning Monday, July 25, 2022, employees at Plant 5 attempted to treat this wastewater in a holding tank to reduce the amount of hexavalent chromium before putting it into the Plant 5 wastewater treatment system. On Friday, July 29, 2022, the wastewater in the holding tank still contained high

concentrations of hexavalent chromium and required more treatment before it could be put through the wastewater treatment system.

Starting on or around the evening of Friday, July 29, 2022, Employee A discharged approximately 10,000 gallons of insufficiently treated wastewater from the holding tank into the Plant 5 wastewater treatment system. Alarms in the wastewater treatment system were activated, indicating that the wastewater required further treatment before it could be discharged to the Wixom sanitary sewer system. Employee A disabled approximately 460 alarms and discharged the wastewater to the Wixom sanitary sewer system and ultimately to the Wixom POTW without completing the treatment necessary to remove chromium from the wastewater, as required by Tribar's IPP Permit.

The defendant did not report the discharge of untreated wastewater to Wixom until Monday, August 1, 2022, at approximately 12:23 PM. The defendant later claimed in a written document submitted to EGLE that it reported the discharge to Wixom at 8:30 AM on August 1, 2022.

## 6.    Advice of Rights

The defendant has read the Information, has discussed the charges and possible defenses with its attorney, and understands the crime charged. The defendant understands that, by pleading guilty, it is waiving many important rights, including the following:

A.    The right to plead not guilty and to persist in that plea;

B.    The right to a speedy and public trial by jury;

C.    The right to be represented by counsel at trial and every other stage of these proceedings;

D.    The right to be presumed innocent and to require the government to prove the defendant guilty beyond a reasonable doubt at trial;

E.    The right to confront and cross-examine adverse witnesses at trial;

F.    The right to present evidence or not to present evidence at trial, whichever the defendant chooses; and

G.    The right to compel the attendance of witnesses at trial.

**7.    Collateral Consequences of Conviction**

The defendant understands that its conviction also could result in additional administrative sanctions such as suspension, debarment, and listing to restrict rights and opportunities of the defendant to contract with or receive benefits, loans, permits, or assistance from agencies of the United States. The defendant understands that no one, including the defendant's attorney or the Court, can predict to a certainty what the additional consequences of the defendant's conviction might be.

**8.    Defendant's Sentencing Factors**

**A.    Court's Determination**

The parties acknowledge that the determination of a fine amount in this case is governed by 18 U.S.C. §§ 3553 and 3572. See USSG § 8C2.1 (Commentary, Background) and 8C2.10. The parties acknowledge that the maximum possible fine for violating the count to which the defendant is pleading guilty is the greater of (1) $200,000; (2) twice the gross pecuniary gain or loss; or (3) $25,000 per day of violation. 18 U.S.C. § 3571(c), (d), and (e); 33 U.S.C. 1319(c)(1). The determination of a term of probation is governed by USSG § 8D1. The Court will

determine the defendant's sentence after consideration of those provisions.

### B.    Parties' Obligations

Both the defendant and the government agree not to take any position or make any statement that is inconsistent with any of the recommendations or factual stipulations in paragraphs 5 and 9.A. Neither party is otherwise restricted in what it may argue or present to the Court as to the defendant's sentence.

### C.    Not a Basis to Withdraw

The defendant understands that it will have no right to withdraw from this agreement or withdraw its guilty plea if it disagrees, in any way, with the sentence determined by the Court, even if that sentence does not incorporate the parties' recommendations or factual stipulations in paragraphs 5 and 9.A. The government likewise has no right to withdraw from this agreement if it disagrees with the sentence determined by the Court.

## 9.    Imposition of Sentence

### A.    Recommendation

Under Federal Rule of Criminal Procedure 11(c)(1)(B), the parties jointly recommend the following sentence:

a.     Fines. The parties stipulate and agree to a total fine of
$200,000. The parties stipulate and agree that this amount shall
be paid as follows: $100,000 within 30 days of entry of the
judgment in this matter and the remaining $100,000 no later than
twelve months after the first payment.

b.     Probation. The parties stipulate and agree that the
defendant shall be sentenced to a term of organizational probation
for a period of five (5) years with the following specific conditions
imposed in addition to the standard conditions:

     i.     No Further Violations. The defendant agrees that it shall
        commit no further significant violations (as determined by
        the Court), which have not been remedied to the
        maximum extent possible within ten (10) days of the
        defendant being notified of the violation, of federal, state,
        or local law or regulations. The term "further significant
        violations" does not include: (1) violations where the
        underlying act or omission occurred prior to this plea
        agreement; and (2) the following known compliance issues
        already being addressed with other agencies: (a)

defendant's alleged wastewater noncompliance for phosphorous being addressed with the Wixom POTW; or (b) defendant's alleged air and water violations in the anticipated civil settlement(s) being negotiated with the State of Michigan's Department of Attorney General and Department of Environment, Great Lakes, and Energy.

ii. <u>Environmental Management System/Compliance Plan.</u> Within the first six months of probation, consistent with the sentencing policies set for in USSG § 8.D.1.4, the defendant agrees to develop, adopt, implement, and fund an Environmental Management System/Compliance Plan ("EMS"). The EMS shall include an annual program at all Tribar facilities to train employees on environmental compliance and ethics, which will ensure that all Tribar employees understand federal, state, and local requirements. The defendant shall be responsible for all costs associated with the development, implementation, maintenance, and monitoring of the EMS. If the defendant changes its name, the renamed company shall

be obliged to meet all the obligations of the defendant under this agreement. If the defendant merges with another company through a stock or asset purchase, or transfers ownership or control of the facility, the newly created or merged company shall be obliged to meet all the obligations of the defendant under this agreement.

iii.  <u>Notification of corporate changes.</u> During the term of probation, Defendant shall notify the United States Probation Office for the Eastern District of Michigan of any corporate name change or any other change in corporate structure or governance that would materially affect this agreement and/or the sentence imposed, within 30 days of such change. No change in name, business reorganization, merger, change of legal status, or similar action or event shall alter Defendant's responsibilities under this agreement. Defendant agrees that it shall not knowingly engage in any action to seek to avoid the obligations and conditions set forth in this agreement.

## B.    No Right to Withdraw

The parties' recommendation in paragraph 9.A is not binding on the Court. The defendant understands that it will have no right to withdraw from this agreement or withdraw its guilty plea if the Court decides not to follow the parties' recommendation. The government likewise has no right to withdraw from this agreement if the Court decides not to follow the recommendation. If, however, the Court rejects or purports to reject any other term or terms of this plea agreement, the government will be permitted to withdraw from the agreement.

## C.    Restitution

The Court must order restitution to every identifiable victim of the defendant's offense. There is no recommendation or agreement on restitution; the parties agree that, at least as of the signing of this agreement, no victims appear to have been physically harmed. The Wixom POTW is a victim and did incur costs related to the illegal discharge described in Paragraph 5. Those costs, and any payment by the defendant toward those costs, will be identified for the court before sentencing. The Court will determine at sentencing who, if anyone, the victims are and the amounts of restitution they are owed.

The defendant agrees that any restitution is due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States. 18 U.S.C. §§ 3612(c) and 3613. If the Court imposes a schedule of payments, the defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full.

The defendant agrees to make a full presentence disclosure of its financial status to the United States Attorney's Office by completing a Financial Disclosure Form and the accompanying releases for the purpose of determining its ability to pay restitution. The defendant agrees to complete and return the Financial Disclosure Form within three weeks of receiving it from government counsel. The defendant agrees to participate in a presentencing debtor's examination if requested to do so by government counsel.

### D.    Special Assessment

The defendant understands that it will be required to pay a special assessment of $125, due immediately upon sentencing.

**10.    Appeal Waiver**

The defendant waives any right it may have to appeal its conviction on any grounds. If the defendant's sentence of probation does not exceed five years, the defendant also waives any right it may have to appeal its sentence on any grounds.

**11.    Collateral Review Waiver**

The defendant retains the right to raise claims alleging ineffective assistance of counsel or prosecutorial misconduct, as long as the defendant properly raises those claims by collateral review under 28 U.S.C. § 2255. The defendant also retains the right to pursue any relief permitted under 18 U.S.C. § 3582(c), as long as the defendant properly files a motion under that section. The defendant, however, waives any other right it may have to challenge its conviction or sentence by collateral review, including, but not limited to, any right it may have to challenge its conviction or sentence on any grounds under 28 U.S.C. § 2255 (except for properly raised ineffective assistance of counsel or prosecutorial misconduct claims, as described above), 28 U.S.C. § 2241, or Federal Rule of Civil Procedure 59 or 60.

## 12.    Consequences of Withdrawal of Guilty Plea or Vacation of Judgment

If the defendant is allowed to withdraw its guilty plea, or if the defendant's conviction or sentence under this agreement is vacated, the government may reinstate any charges against the defendant that were dismissed as part of this agreement and may file additional charges against the defendant relating, directly or indirectly, to any of the conduct underlying the defendant's guilty plea or any relevant conduct. If the government reinstates any charges or files any additional charges as permitted by this paragraph, the defendant waives any right to challenge those charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## 13.    Use of Withdrawn Guilty Plea

The defendant agrees that if it is permitted to withdraw its guilty plea for any reason, it waives all of its rights under Federal Rule of Evidence 410, and the government may use its guilty plea, any statement that the defendant made at its guilty plea hearing, and the factual basis set forth in this agreement, against the defendant in any proceeding.

14. **Parties to Plea Agreement**

This agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan and the Environmental Crimes Section, Environment & Natural Resources Division, U.S. Department of Justice.

15. **Corporate Authorization**

Prior to entry of plea, the defendant will provide to the Court and the government a corporate resolution authorizing the entry of a plea of guilty to Count 1 of the Information, and compliance with all provisions of this Agreement, and that Defendant's designated representative is authorized to appear on behalf of the defendant to enter the guilty plea in the Eastern District of Michigan and appear for imposition of the sentence, including by remote means.

16. **Scope of Plea Agreement**

This plea agreement is the complete agreement between the parties and supersedes any other promises, representations, understandings, or agreements between the parties concerning the subject matter of this agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to the defendant or to the attorney for the defendant

at any time before the defendant pleads guilty are binding except to the

extent they have been explicitly incorporated into this plea agreement.

If the parties have entered, or subsequently enter, into a written proffer

or cooperation agreement, though, this plea agreement does not

supersede or abrogate the terms of that agreement. This plea

agreement also does not prevent any civil or administrative actions

against the defendant by the United States or any other party.


Dawn N. Ison
United States Attorney


_____          _____
Mark Chasteen                             Karen L. Reynolds
Chief, White Collar Crime Unit            Assistant U. S. Attorney
Assistant U. S. Attorney


Dated:

By signing below, the defendant and its attorney agree that the

defendant has read or been read this entire document, has discussed it

with its attorney, and has had a full and complete opportunity to confer

with its attorney. The defendant further agrees that it understands this

entire document, agrees to its terms, has had all its questions answered

by its attorney, and is satisfied with its attorney's advice and

representation.

_____

Madelaine C. Lane
Warner Norcross + Judd LLP
Attorney for Tribar
Technologies, Inc.

_____

Rian Branning
Chief Restructuring Officer
On Behalf of Defendant
Tribar Technologies, Inc.

Dated:   December 16, 2024

## APPENDIX A:

## TRIBAR ENVIRONMENTAL MANAGEMENT SYSTEM/COMPLIANCE PROGRAM

### I.   BACKGROUND AND PURPOSE

1.      As part of the Plea Agreement, Tribar has agreed to develop, adopt, implement, and fund an Environmental Management System/Compliance Plan (EMS). This EMS applies to all Tribar facilities in the state of Michigan. Tribar shall adhere to this EMS for the entire term of probation under the Plea Agreement.

2.      In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Clean Water Act (CWA), the CWA's implementing regulations, and other federal environmental laws (collectively, "federal environmental laws"), Tribar agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

3.      When necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal controls designed to ensure the making and keeping of fair and accurate records related to the development and submission of documents concerning compliance with federal environmental laws; and (b) a rigorous compliance program that incorporates relevant internal controls, as well as policies and procedures designed to effectively detect and deter violations of federal environmental laws.

### II.   DEFINITIONS

4.  The terms used herein shall have the meanings set below:

    a.   "Audit" means a third-party audit as described in the Protocol.

1

b. "Auditor" means a third-party auditor as specified in or approved pursuant to the Protocol.

c. "Capital Expenditure" means, for purposes of any corrective measure required, an expenditure that is estimated to be more than $50,000.

d. "CWA" means the federal Clean Water Act and any state equivalent statute, and all federal, state, and local regulations and permits promulgated or issued thereunder.

e. "EPA" means the U.S. Environmental Protection Agency.

f. "Facilities" means the Tribar plants located in the state of Michigan that remain operational. A complete list is set forth as follows, although Wixom Plant 1 and Wixom Plant 4 are currently shut down with no plans to resume operations:

    i. 30517 Anderson Ct., Wixom, MI (Wixom Plant 1)

    ii. 29835 Beck Rd., Wixom, MI (Wixom Plant 2)

    iii. 29883 Beck Rd., Wixom, MI (Wixom Plant 3)

    iv. 30540 Beck Rd., Wixom, MI (Plant 4)

    v. 48668 Alpha Dr., Wixom, MI (Plant 5)

    vi. 2211 Grand Commerce Dr., Howell, MI (Howell Plant 1)

    vii. 2212 Grand Commerce Dr., Howell, MI (Howell Plant 2)

g. "Finding" means an item that the Auditor has assessed to be in present noncompliance with the applicable requirements of the CWA at the time of the Audit.

h. "Parties" means Tribar and the United States.

i. "Protocol" means the Third Party Audit Protocol in Part X.

j. "Tribar" or the "Company" means the Defendant.

### III. HIGH-LEVEL COMMITMENT

5. The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violating federal environmental laws.

### IV. POLICIES AND PROCEDURES

6. The Company will develop and promulgate a clearly articulated and visible corporate policy against violating federal environmental laws, which policy must be memorialized in a written compliance code.

7. The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of federal environmental laws, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violating federal environmental laws by personnel at all levels of the Company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company. The Company must notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.

8. The Company will ensure that it has a system of compliance policies and procedures, including a system of internal controls, reasonably designed to ensure the prevention and detection of violations of federal environmental laws.

### V. PERIODIC RISK-BASED REVIEW

9. The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

3

10.    The Company shall review its compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, considering relevant developments in the field and evolving regulatory and industry standards.

## VI.    PROPER OVERSIGHT AND INDEPENDENCE

11.    The Company will assign responsibility to one or more senior corporate executives of the Company (such as the Environmental, Health and Safety Manager) for the implementation and oversight of the Company's compliance code, policies, and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

## VII.    TRAINING AND GUIDANCE

12.    The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures are effectively communicated to all directors, officers, and employees. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, and positions that require such training; and (b) corresponding certifications by all such directors, officers, employees, and agents, certifying compliance with the training requirements.

13.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, and employees.

## VIII.    INTERNAL REPORTING AND INVESTIGATION

14.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers,

employees, and where appropriate, agents concerning violations of federal environmental laws or the Company's compliance code, policies, and procedures.

15.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of federal environmental laws or the Company's compliance code, policies, and procedures.

## IX.    ENFORCEMENT AND DISCIPLINE

16.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately urging compliance and disciplining violations.

17.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of federal environment laws and the Company's compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company must implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program is effective.

## X.   THIRD PARTY AUDIT PROTOCOL

18.   As part of implementing the EMS in this Appendix A, Tribar will conduct third-party Audits of its current compliance with the CWA at the Facilities. This Protocol governs the Audit process.

19.   <u>Third-Party Auditor</u>

 a.   Tribar and EPA have agreed that Tribar must use an auditor approved by EPA to perform third-party audits until such time, if any, that Tribar proposes and EPA approves a replacement or additional Auditor pursuant to this section of the Protocol. The Auditor may use competent professionals on their staff to assist with the Audits.

 b.   Tribar may propose to replace any Auditor or may propose to add any additional Auditor by submitting a request to EPA. The request shall indicate the reason for the change or addition; the qualifications of the proposed Auditor; and any other relevant information.

 c.   Tribar shall be solely responsible for paying for each Auditor's fees and expenses.

20.   <u>Audit Protocol</u>

 a.   The Auditor shall conduct on-site Audits of all Facilities according to the schedule set forth in this Protocol. The purpose of the on-site Audits is to assess present compliance with the CWA at the time of the Audits. The Audits shall cover, but are not limited to, the following: wastewater treatment plants, CWA compliance, Permit compliance (as applicable: pre-treatment permits, National Pollutant Discharge Elimination System (NPDES) permits, and associated

6

documents such as stormwater pollution prevention plans), and general CWA requirements.

b.  Representative(s) of EPA and the Michigan Department of Environment, Great Lakes, and Energy (State CWA Agency) are welcome to observe any Audit or part without prior notice. Tribar shall notify EPA and the State CWA Agency at least forty-five (45) days prior to the initiation of each audit.

c.  The Auditor must produce a report in accordance with this Protocol documenting the specific Findings that existed at the time of the Audit. The Auditor may report observations that do not rise to the level of Findings, but such observations shall be listed separately.

21.  <u>Timeline for the Audits</u>

a.  On-site Audits of the Facilities required by this Protocol must commence no later than 30 days after implementation of the EMS. Tribar shall ensure that at least 3 Facilities are audited within 12 months after commencement of the Audits and that all Audits are concluded within 24 months after commencement of the Audits.

b.  The Parties expect each on-site Audit to take around 3 business days to complete.

c.  When possible, the on-site Audits will be conducted over consecutive business days, but the Parties acknowledge that may not always be possible. Within 30 days after completing each on-site Audit, the Auditor must provide a report simultaneously to Tribar, EPA, the Probation Office, and the State CWA Agency. Tribar shall respond to the report pursuant to this Protocol.

7

22.    <u>Responses and Corrective Measures</u>

   a.  Tribar shall submit a response to each Audit report that contains Findings no later
       than 45 days after receipt of the report. The response must include a plan to
       correct any Findings, except any Finding(s) that Tribar disputes pursuant to this
       Protocol, and classify whether the response requires Capital Expenditures. EPA
       may request verification documentation for any response requiring Capital
       Expenditures. Tribar shall correct Findings that do not require Capital
       Expenditures within 6 months, unless more time is sought by Tribar and approved
       by EPA. Tribar shall correct Findings that require Capital Expenditures within 12
       months, unless more time is sought by Tribar and approved by EPA, subject to
       dispute resolution pursuant to this Protocol. Once Tribar has completed
       implementation of any corrective measure for any Finding, it shall certify the
       completion of that work to EPA in its periodic reports as required below.

   b.  Tribar may, but need not, submit a response to any observation or other statement
       that is not categorized as a Finding in any Audit report if Tribar wishes to do so. If
       Tribar elects to submit such a response, it must do so within 45 Days of receipt of
       the report. Tribar will have no obligation under this Protocol to correct or
       otherwise address observations or other statements (other than Findings) in any
       Audit report.

23.    <u>Dispute Resolution</u>

   a.  Should Tribar disagree with any Finding(s) or any other aspect of any Audit
       report or should EPA not approve a request for greater than 12 months to correct a
       Finding that requires a Capital Expenditure, it may invoke dispute resolution. The

8

procedure for dispute resolution is set forth in this Protocol. The invocation of dispute resolution shall not relieve Tribar of its obligations under this Protocol with respect to any other Finding(s). Should the dispute be withdrawn or resolved informally or formally in favor of EPA, Tribar shall amend its response to the Audit report pursuant to this Protocol to include the disputed Findings. Should the dispute be resolved in favor of Tribar, no amendment shall be necessary. Neither a Tribar decision regarding dispute resolution nor its response to any Finding(s) or other element(s) of any Audit report shall constitute an admission of any fact or liability.

b. If the Parties have any disputes related to any Findings by the Auditor, they may raise the dispute with the U.S. Probation Office for resolution, subject to the terms of this Appendix A. If one or both Parties are dissatisfied with the resolution of the dispute after raising it with the Probation Office, they may seek other resolution with the Court in accordance with this Appendix A.

c. Dispute resolution will commence upon written notice of dispute by Tribar and must be followed by an initial period of informal negotiations of 21 days, extendable by agreement. If the dispute is not resolved by informal negotiations, Tribar may file a motion with the Court seeking a resolution of the dispute, and the United States may respond.

d. The Parties agree to request that the Court provide 30 days for the United States to respond and 15 days for Tribar to reply (if any).

24. Compliance with this Protocol does not preclude civil or criminal liability for any Findings. In any event, it is the intent of the Parties to provide Tribar, acting in good faith, with

9

reasonable opportunity to identify and correct Findings pursuant to this Protocol without the need for further enforcement action.  Nothing in this Protocol limits the ability of the State CWA Agency to pursue separate enforcement action(s).

## XI.    TRAINING FOR WWTP OPERATORS

25.    Tribar shall develop and conduct training for all WWTP operators at all of its WWTPs at the Facilities.

a.  The training must include both specific training related to "lessons learned" from the incident (for example, regarding failure to adequately treat wastewater, requirements for discharges into sanitary sewers, notification requirements related to discharges into sanitary sewers, etc.) as well as WWTP operator refresher training (for example, regarding the permit(s) at each location and applicable compliance standards).

b.  The training will be conducted in-person and shall be at least 2 hours.

c.  Tribar shall complete its preparation of the presentation material for this training no later than 90 days after sentencing.

26.    Schedule and Procedures for Training

a.  Training must commence no later than 90 days after sentencing.

b.  The training will be conducted in-person and must be tracked.

c.  All training must be completed within 15 months after commencement of the training.

d.  Tribar shall provide periodic reports to EPA, the Probation Office, and the State CWA Agency regarding compliance with training requirements pursuant to this Appendix A.

10

## XII.   MAINTAINING IMPROVEMENTS

27.      After the incident that gave rise to the Plea Agreement, Tribar took various

actions to improve its policies and procedures to prevent a recurrence of the incident, including

providing updated wastewater pretreatment system drawings, staff training regarding the

operation of the upgraded wastewater pretreatment and discharge control systems, updating the

Standard Operating Procedures (SOPs) that cover the upgraded wastewater pretreatment system

(including discharge control systems), creating an updated operation and maintenance manual

reflecting all pretreatment and discharge control systems as upgraded, and increased staffing.

28.      Tribar shall maintain these amended policies and procedures in effect during the

term of probation except that it may make further improvements as part of updating its

environmental management systems so long as the improvements do not render the policies and

procedures any less stringent. Tribar shall provide a copy of any changes to any of these policies

and procedures to EPA and the State CWA Agency within 30 days of making such changes until

Tribar's period of probation is complete.

## XIII.   PERIODIC REPORTING

29.      Within 45 Days after the end of each full calendar-quarter (i.e., by April 30, July

30, October 30, and January 30) after sentencing, Tribar shall submit a quarterly report

summarizing its progress towards completing its obligations under this Appendix A. Quarterly

reporting will continue until the final report required below is submitted. In particular, the

quarterly report shall describe the following:

   a.   The status of conducting the Audits pursuant to this Appendix A.

   b.   The status of submission of the Audit reports pursuant to this Appendix A.

   c.   The status of Tribar's responses to the Audit reports, above.

11

  d. The status of any disputes over any Findings in any Audit reports.

  e. The status of implementation of measures to correct Findings, including any certifications of completion.

  f. The status of the development of the training presentation materials required pursuant to Part XI.

  g. The status of conducting the training required pursuant to Part XI.

  h. A description of any non-compliance with this Appendix and a description of the likely cause and any remedial steps taken, or to be taken, to prevent or minimize such noncompliance with this Appendix.

30. Within 45 days after Tribar has completed all Audits and training required by this Appendix A, it shall submit a final report containing the elements listed, above, demonstrating that the Audits and training are complete.

## XIV. NON-COMPLIANCE

31. Compliance with the terms of this Appendix A does not release Tribar from complying with all applicable federal or state environmental statutes, regulations, or rules, or judicially imposed probationary terms, and does not limit imposition of any sanctions, penalties or any other actions available under those statutes, regulations, or rules. Failure to comply with any material term of this Appendix A shall be considered a violation of probation, provided that the non-compliance is not remedied to the maximum extent possible within 10 days of notice of the violation from the United States Attorney's Office, EPA, or the Probation Office.

## XV.    CONTACTS

32.    The reports and notices required by this Appendix A shall be provided to the United States Attorney's Office, EPA, the Probation Office, and the State CWA Agency to the points of contact in the method (paper or electronic) specified by those organizations.

13